**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

<table>
<tr><td>19 MK LLC and OV3RWATCH<br>FOUNDATION CHARITABLE TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>THE OVERWATCH FOUNDATION,<br><br>Defendant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 24 C 3630<br><br>Judge Joan H. Lefkow</td></tr>
</table>

**<u>OPINION AND ORDER</u>**

19 MK LLC (19 MK) and Ov3rwatch Foundation Charitable Trust (OFCT) bring this action against the Overwatch Foundation (the Foundation), asserting trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[1] (Dkt. 1.) The Foundation brings counterclaims for cancellation of the "OV3RWATCH FOUNDATION" registrations due to naked licensing and non-use and for tortious interference with prospective economic advantage. (Dkt. 14.) Plaintiffs and defendant move for summary judgment—plaintiffs on both of their claims and on all of the Foundation's counterclaims (dkt. 56), and the Foundation on plaintiffs' claims and its tortious interference counterclaim (dkt. 47). This opinion addresses both motions. For the reasons stated below, the Foundation's motion (dkt. 47) is granted in part and denied in part, and plaintiffs' motion (dkt. 56) is granted in part and denied in part.

---

[1] Citations to the Lanham Act will hereafter be to 15 U.S.C. as, for example, § 1114, § 1125.

**BACKGROUND**

Plaintiff Ov3rwatch Foundation Charitable Trust is a § 501(c)(3) charity formed in Houston, Texas, in 2017 by Troy Genzer. Genzer testified that he created the trust to raise funds and deliver charitable programs. OFCT's website states its mission "is to improve the effectiveness and efficiency of law enforcement in our communities through shared responsibilities and resources." (Dkt. 57-4 at 17.) OFCT supports and delivers charitable programs like trainings directed at law enforcement and public safety audiences. It also supports programming for young people interested in law enforcement, including by providing financial and volunteer support for young people participating in the National Explorers program, where they learn about careers in law enforcement.

Parties dispute what other activities OFCT performs and its geographic reach. For example, in their fact statement, plaintiffs assert they have sold OV3RWATCH FOUDATION-branded merchandise in Texas, Tennessee, Ohio, and Las Vegas, Nevada, citing paragraph eight of Genzer's first declaration and three photograph exhibits for support. One of the photographs shows what appear to be t-shirts for sale in a room where a lecture is taking place. The other two are close-up photographs of the t-shirts showing the "OV3RWATCH FOUNDATION" mark.

The Foundation argues that the declaration testimony on this issue is unsupported by any evidence in the record and that there is no testimony regarding what the photographs depict. At summary judgment, a sworn declaration containing information within the declarant's personal knowledge is admissible. As the managing representative of OFCT, Genzer testified that he controls the merchandise and the public-facing activities occurring under the OV3RWATCH FOUNDATION brand. As such, the contents of paragraph 8 of Genzer's first declaration fall within his personal knowledge and are admissible. *See Priester* v. *WMAQ A.M. Radio*, No. 97 C

2

7959, 1999 WL 356297, at *4 (N.D. Ill. May 24, 1999) (citing *Hadley* v. *County of DuPage*, 715 F.2d 1238, 1243 (7th Cir. 1983). The photographs, which lack context and are unexplained by testimony, do little to support the assertion of the locations where merchandise was sold. Based on Genzer's testimony, however, the court concludes that there is sufficient evidence showing plaintiffs offered OV3RWATCH FOUNDATION merchandise for sale in Texas, Tennessee, Ohio, and Las Vegas, Nevada.

Parties also dispute when OFCT started using the "OV3RWATCH FOUNDATION" mark in commerce. OFCT claims it began using the mark in 2017. For support, it cites to Genzer's first declaration, "Exhibit D," and a Bates range. Exhibit D appears to be a document production made by plaintiffs. It does not contain the cited-to Bates range, nor any document supporting when the mark was first used. One of the Foundation's exhibits, however, includes the trademark registration for the "OV3RWATCH FOUNDATION" mark and notes its first use in commerce was July 2017.[2]

Plaintiff 19 MK is a Wyoming limited liability company formed on October 3, 2022, to be a holding company for intellectual property. On the same day that 19 MK was formed, OFCT assigned to it the "OV3RWATCH FOUNDATION" brand. Also on October 3, 2022, 19 MK licensed back to OFCT the "OV3RWATCH FOUNDATION" brand. 19 MK then applied for four trademarks for the "OV3RWATCH FOUNDATION" on December 25 and 26, 2022. Four trademark registrations for "OV3RWATCH FOUNDATION" were registered with the United States Patent and Trademark Office (USPTO) on July 25, 2023, under the registration numbers

---

[2] While it is not the court's responsibility to comb through the record to find evidence supporting plaintiffs' assertions, having come across evidence to clarify this fact dispute, the court takes it into account. *See Compania Administradora de Recuperacion* v. *Titan Int'l., Inc.*, 533 F.3d 555, 562 (7th Cir. 2008) (A district court "cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that creates a genuine issue of material fact for trial.").

7121953, 7121954, 7121955, and 7121956. 19 MK owns the "OV3RWATCH FOUNDATION" trademarks.

Defendant Overwatch Foundation was formed in March 2022 by Mark Turner, a combat veteran, and Bradley Johns, with the goal of providing humanitarian support and aid in conflict areas within hostile environments. The Foundation is headquartered in Naperville, Illinois. The Foundation has provided its services abroad in Ukraine, Israel, Gaza, and the West Bank. In the United States, it has provided humanitarian relief in hurricane disaster zones, including during the aftermaths of Hurricanes Ida, Ian, and Milton, which occurred in Louisiana and Florida. The Foundation began using "The Overwatch Foundation" mark on or around March 9, 2022, when it ran its first mission in Ukraine. Turner chose the name based on the military concept of "overwatch," which he defined as "providing cover or looking after … someone's movement [or] position … watching their back, helping them when they need it, being able to see things that they may not see. It's a common military function and a civilian function as well." (Dkt. 59 ¶ 14; dkt. 61 ¶ 10.) At the time Turner adopted the name The Overwatch Foundation, he had not heard of plaintiff Ov3rwatch Foundation Charitable Trust.[3]

---

[3] In their response to defendant's statement of facts, plaintiffs dispute that "[p]rior to receipt of the cease-and-desist letter, neither Mark Turner nor Overwatch had ever heard of 19 MK or OFCT, and had never heard of 'OV3RWATCH FOUNDATION.'" (Dkt. 61 ¶ 14.) Plaintiffs elaborate that though Turner did testify as such, defendant's assertion is overstated because "[a]t the time Defendant selected its domain name, www.overwatchfoundation.org was already registered and in use, and Defendant instead selected www.overwatchfoundationusa.org. Plaintiffs contend that this fact permits a reasonable inference that Defendant encountered the existing OV3RWATCH FOUNDATION name or domain during the domain-selection process." (*Id*.)

It permits no such inference. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact[.]" Local Rule 56.1(e)(3); *see also Grigsby* v. *La Rabida Child.'s Hosp.*, No. 20 C 67, 2024 WL 3950121, at *1 (N.D. Ill. Aug. 27, 2024) ("[S]everal of [plaintiff]'s responses to Defendants' Material Facts either cite evidence in the record that does not actually controvert the relevant factual assertion or fail to cite any evidence whatsoever…. Accordingly, the Court deems Defendants' facts to which these improper responses are directed admitted."). Especially in the absence of any evidence supporting this inference, the court does not credit plaintiff counsel's hypothesizing that Turner might have known about plaintiffs' use of the mark prior to the cease-and-desist letter. The court considers this fact admitted.

After creating the Foundation, Turner appeared on at least ten podcasts between March 2022 and November 2023 to discuss his military experience and the work he was doing with the Foundation, including the Shawn Ryan Show, the Mike Ritland Podcast, and several others. In the aftermath of Turner's podcast appearances, the Foundation received a bump in donations. The Foundation has also appeared on Fox News, CNN, and the Washington Post. Defendant operates the website www.helpteamoverwatch.org to publicize its missions and receive donations. It also operates an Instagram page, @theoverwatchfoundation, which, along with the website, "contain[s] content and information regarding [the Foundation's] humanitarian relief efforts, volunteer opportunities[,] and where people can donate to support those efforts." (Dkt. 57-7 at 4.)

In January 2023, 19 MK sent the Foundation a cease-and-desist letter, asserting that the foundation was infringing on its trademark "OV3RWATCH FOUNDATION." The letter demanded that the Foundation stop all current and future use of the mark. The Foundation did not stop using the mark. In November 2023, 19 MK sent a series of letters to the podcasts on which Turner had appeared. The cease-and-desist letters informed the podcasts that they may be subject to legal action for contributory trademark infringement unless they remove any reference to the Foundation. Turner never appeared on another podcast. He testified that this was because podcasters were concerned to have him back after receiving the letters, and he did not want to put his friends (he had relationships with several of the podcast hosts, as most of them shared a background in the military) in an uncomfortable position. Turner testified that, as a result of 19 MK's letters, the Foundation lost the bump in donations that would come after podcast appearances.

Both parties move for summary judgment.

5

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The law considers a dispute genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lord* v. *Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba* v. *Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted).

The moving party "bears the burden of demonstrating the absence of genuine issues of material fact." *LaRiviere* v. *Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (citation omitted). If the moving party meets that burden, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer* v. *Rossman*, 798 F.3d 502, 507 (7th Cir. 2015) (citation omitted).

**ANALYSIS**

**I.     Section 1114 Infringement of a Registered Mark**

Both sides argue for summary judgment in their favor on plaintiffs' claim for trademark infringement and counterfeiting under § 1114. Plaintiffs argue that they are entitled to a statutory presumption of validity, ownership, and exclusivity of the mark and that they are the senior users of the mark in nationwide commerce. The Foundation argues that, because it began using the name "Overwatch Foundation" before 19 MK filed for its registrations of the "OV3RWATCH FOUNDATION" mark, the priority conferred by 19 MK's registrations does not apply against the Foundation as a prior good faith user of the Overwatch Foundation mark.

6

### A. Section 1114 Standing

Section 1114 "creates a cause of action for a trademark 'registrant' when a defendant uses a registered trademark without consent." *Fin. Inv. Co. (Bermuda)* v. *Geberit AG*, 165 F.3d 526, 531 (7th Cir. 1998) (quoting 15 U.S.C. § 1114(1)). The term "registrant" includes the person or entity that registered the trademark and its "legal representatives, predecessors, successors and assigns." *See* § 1127. "Registrant" does not include licensees. *See Gruen Mktg. Corp.* v. *Benrus Watch Co.*, 955 F. Supp. 979, 982 (N.D. Ill. 1997). Licensees typically do not have standing to bring suit under § 1114. *Cent. Mfg. Co.* v. *Pure Fishing, Inc.*, 392 F. Supp. 2d 1046, 1047 (N.D. Ill. 2005) ("[A] licensee lacks standing to bring a claim under the Act when provisions in the licensing agreement indicate that the licensor retains exclusive ownership of the mark."); *see also* 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:3 (5th ed.) ("[O]nly the federal 'registrant' has standing to sue for infringement of a federally registered mark.").

19 MK is the owner and registrant of the "OV3RWATCH FOUNDATION" trademark. OFCT is a licensee of the mark. As such, 19 MK has standing to bring a § 1114 claim, while OFCT does not. *See Fin. Inv. Co. (Bermuda)*, 165 F.3d at 531; *Cent. Mfg. Co.*, 392 F. Supp. 2d at 1047; *and see* (dkt. 57-2 at 3.) ("[19 MK] is the *sole and exclusive owner of the rights* to the brand 'OV3RWATCH FOUNDATION.' … [OFCT] acknowledges that nothing in the Agreement grants [it] any rights, title, or other interest in the Mark(s) licensed in this Agreement, except the right to use such Mark(s)[.]") (emphasis added).

Plaintiffs acknowledge this, but they argue that the Foundation is not entitled to summary judgment on the complaint as a whole because of it. The Foundation cabins its standing argument to the § 1114 claim only, so plaintiffs' argument is inapposite. Plaintiffs go on to assert

7

that "Defendant's attempt to collapse the case into a single 'registrant-only' standing theory ignores that § 1125 remains live and fact-dependent." (Dkt. 60 at 9.) The Foundation does not bring a "registrant-only" standing theory to the § 1125(a) claim, discussed *infra*, but instead acknowledges there exactly what plaintiffs point out: § 1125(a) provides broader standing. As the law is clear that only the registrant may bring a § 1114 claim, OFCT lacks standing to bring a claim under this section. As such, for the purposes of this claim, the court considers only facts as they relate to 19 MK, and not those relevant only to OFCT.

### B. Merits of Section 1114 Claim

To prevail on a § 1114 claim, the trademark registrant must show both that it owns a protectable trademark and likelihood of confusion on the part of the public. *Bobak Sausage Co.* v. *A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 512 (N.D. Ill. 2011) (citing *Ty, Inc.* v. *The Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)). The court begins by analyzing the protectability of the trademark. When a registrant applies for a trademark, it gains a rebuttable presumption of use as of the filing date. *S.C. Johnson & Son, Inc.* v. *Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016). But a "trademark application is always subject to previously established common law trademark rights of another party." *Id*. (quoting *Johnny Blastoff, Inc.* v. *Los Angeles Rams Football Co.*, 188 F.3d 427, 435 (7th Cir. 1999)); *see also* 15 U.S.C. § 1057(c)(1). Under § 1115(b)(5), "a party may continue to use a registered mark in a limited geographic trade area, despite the existence of a senior user, provided that certain conditions are met. 'The party without the federal registration must prove its prior and continuous rights in a market that preempts the registrant's constructive nationwide rights.'" *Ledo Pizza Sys., Inc.* v. *Ledo's Inc.*, No. 20 CV 7350, 2024 WL 1013897, at *8 (N.D. Ill. Mar. 7, 2024) (quoting *Pure*

*Imagination, Inc.* v. *Pure Imagination Studios, Inc.*, No. 03 C 6070, 2004 WL 2967446, at \*10 (N.D. Ill. Nov. 15, 2004)).

To rebut the registrant's presumption of use, a defendant must prove the following four elements, known as the intermediate junior user defense:

> (1) that its … original adoption and first use of the mark was in a 'remote' area; without knowledge of plaintiff's prior use or was otherwise in 'good faith'; (2) that it can trace use or title back to a date of original adoption and use prior to the date of plaintiff's federal application or registration; (3) that its use has been continuous in area X since that time; and (4) the extent of trade area X either at the time plaintiff's federal registration issued or at the time of a post-1989 application.

4 MCCARTHY § 26:44 (5th ed.) (citations omitted); *see also S.C. Johnson*, 835 F.3d. at 666.

As an initial matter, the parties agree that 19 MK has never actually used the mark. As OFCT has no standing to bring a § 1114 claim, its use of the mark is not relevant to this claim.[4] The fact that the only party with standing has never used the at-issue mark anywhere is enough to defeat the presumption of prior use. *See Zazu Designs* v. *L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("'Use' is neither a glitch in the Lanham Act nor a historical relic. By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly."). But for the sake of completeness, the court examines each element of the intermediate junior user defense outlined above.

Turning to the first element of the defense, the Foundation must show that it adopted the mark without knowledge of 19 MK's prior use. Turner testified that he was unaware of either plaintiff's use of the mark when the Foundation began using it in March of 2022. Turner, a

---

[4] While a licensor may assert indirect use of a mark in commerce by showing that it exercises control over a licensee's use of a mark, plaintiffs do not make this argument here. *See Slep–Tone Ent. Corp.* v. *Coyne*, 141 F.Supp.3d 813, 824 (N.D. Ill. 2015) (quoting *Eva's Bridal Ltd.* v. *Halanick Enters., Inc.*, 639 F.3d 788, 790 (7th Cir. 2011). Arguments not made are considered waived. *See Garfield Aurora I, LLC* v. *Greater N.Y. Mut. Ins. Co.*, No. 21 C 5582, 2026 WL 905446 (N.D. Ill. Apr. 2, 2026) (citing *Bonte* v. *U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)). And even if plaintiffs had asserted this argument, there is a genuine question as to whether 19 MK exerts control over the mark. *See infra*.

former marine and combat veteran, chose the name because the military concept of "overwatch," means to "provid[e] cover or looking after … someone's movement [or] position … watching their back, helping them when they need it, being able to see things that they may not see." (Dkt. 59 ¶ 14; dkt. 61 ¶ 10.) 19 MK has offered no evidence to rebut Turner's testimony that he was unaware of 19 MK's prior use. *See* n.1, *supra*. The Foundation has thus established that it adopted the mark in good faith.

The second element—date of original adoption and use must be prior to the date of plaintiff's federal application—is easily met. 19 MK applied for trademarks for "OV3RWATCH FOUNDATION" on December 25 and 26, 2022. The Foundation started using the Overwatch Foundation mark on or around March 9, 2022. The Foundation's adoption and use of the mark precedes 19 MK's December 2022 applications.

The Foundation must also show that its use of the mark has been continuous since its initial adoption. "A wide variety of sources may demonstrate 'use' sufficient for public identification of a mark, including '[advertisements] … in media outlets such as television and radio.' So long as the trademarked goods or services are actually provided through or in connection with it, 'a website that bears a trademark may constitute a *bona fide* use in commerce.'" *S.C. Johnson*, 835 F.3d at 666 (quoting *Specht* v. *Google Inc.*, 747 F.3d 929, 934–35 (7th Cir. 2014)). Turner has been running the Foundation, headquartered in Naperville, Illinois, since March 2022. Between March 2022 and November 2023, Turner appeared on at least ten podcasts to discuss the activities of the Foundation. The Foundation has also appeared on Fox News, CNN, and the Washington Post. Defendant operates the website www.helpteamoverwatch.org to publicize its missions and receive donations. It also operates an Instagram page, @theoverwatchfoundation, which, along with the website, "contain[s] content

10

and information regarding [the Foundation's] humanitarian relief efforts, volunteer opportunities[,] and where people can donate to support those efforts." (Dkt. 57-7 at 4.) These efforts include the services it has provided in Ukraine, Israel, Gaza, and the West Bank. Turner testified that the Foundation made about six trips to Ukraine, beginning in 2022, and 13 trips to Israel, Gaza, and the West Bank, beginning in 2023. The Foundation continued to perform operations both abroad and domestically in November 2023, January 2024, March 2024, May 2024, August 2024, October 2024, and December 2024, with plans to continue, as of Turner's August 2025 deposition. The Foundation's use of the mark has been continuous.

This leaves the court to assess the geographic span of the Foundation's defense. 19 MK does not challenge the Foundation's operations in Illinois but does argue that the Foundation also operates nationally via its online solicitation and national media promotion. Therefore, plaintiffs argue, a "jury could reasonably conclude that these channels reached donors and supporters well beyond any narrow local territory," so the Foundation cannot establish a remote-market defense. (Dkt. 60 at 4–5.)

"Establishing a defined trade area is necessary because the intermediate junior user defense is limited to 'the area in which such continuous prior use is proved.'" *Ledo Pizza*, 2024 WL 1013897 at *9 (quoting 15 U.S.C. § 1115(b)(5)); *see also Safeway Stores, Inc.* v. *Safeway Quality Foods, Inc.*, 433 F.2d 99, 104 (7th Cir. 1970) (holding that defendants could continue to use a mark in the area where they operated prior to the plaintiff's registration of the mark). It is undisputed that the Foundation's headquarters are in Naperville, Illinois, the sole location from which it solicits donations and runs its charitable services. Comparably to *Ledo Pizza*, 2024 WL 1013897, at *9 (citing *S.C. Johnson*, 835 F.3d at 666), the evidence of the Foundation's

11

operations is "sufficient [] to establish the continuous use of the mark in a trade area, though its exact boundaries have not yet been established by the defendant."

As to 19 MK's argument that internet use destroys a remote-user defense, "the law is clear that the internet itself is not a territory that is capable of being claimed." *Ledo Pizza*, 2024 WL 1013897, at *9 (citing 4 McCarthy, § 26:30.50). "Merely being the senior user of a mark on the internet does not thereby create an exclusive right to the mark for internet use in all territories of the United States (or the world). The internet (or cyberspace) is not a 'territory.'" 4 MCCARTHY, § 26:30.50.[5]

19 MK, the only plaintiff with standing to bring a § 1114 infringement claim, has never used the mark at issue. And even if it had, the Foundation has proved its intermediate junior user defense. The court therefore grants the Foundation's motion for summary judgment on its § 1114 infringement defense and denies 19 MK's motion on the same.

## II.     Section 1125(a) False Designation of Origin

The Foundation next argues that the court should grant summary judgment against plaintiffs' claim for false designation of origin under § 1125(a). Section 1125(a) governs unfair competition and false advertising claims. *Johnny Blastoff*, 188 F.3d at 438. It creates a right of action for both registered and unregistered marks. *Two Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Before federal registration of a trademark, priority is determined by first and sufficient use in a market area. *See Zazu Designs*, 979 F.2d at 502–03.

Unlike under § 1114, a "plaintiff need not be the owner of a registered trademark in order to have standing to sue," under § 1125(a). *Holbrook Mfg LLC* v. *Rhyno Mfg. Inc.*, 497 F. Supp.

---

[5] As the court concludes that plaintiffs lack protectable trademark rights under § 1114 because of the Foundation's priority of use in Illinois, the court does not reach the second prong of plaintiffs' § 1114 claim: likelihood of confusion.

3d 319, 329 (N.D. Ill. 2020) (quoting *Specht* v. *Google, Inc.*, 660 F. Supp. 2d 858, 867 (N.D. Ill. 2009). Courts have interpreted the statute "to limit standing to persons who show proof of ownership of a proprietary right or a reasonable interest to protect." *Id.* Plaintiffs have asserted— and the Foundation does not dispute—that OFCT is a licensed user of the "OV3RWATCH FOUNDATION" mark. OFCT's representative testified that OFCT has used the mark for years as it provided support for tactical and rescue-related training for law enforcement and first responder agencies; provided support for hurricane-relief efforts; raised funds for young people interested in law enforcement careers; and sold branded merchandise. While the Foundation disputes many of these points, the court has concluded that OFCT at least sold branded merchandise in Texas, Tennessee, Ohio, and Las Vegas, Nevada. *See supra*. Therefore, OFCT has sufficiently established that it, along with 19 MK, has standing to allege a § 1125(a) claim against the Foundation. *See Gruen Mktg. Corp.* v. *Benrus Watch Co.*, 955 F. Supp. 979, 984 (N.D. Ill. 1997) ("Because [plaintiff] possesses a license to use the [] mark, [plaintiff] has standing under [§ 1125](a) to bring an action against … defendants.").

To determine whether a senior user has achieved sufficient market penetration in an area to warrant protection of its common law rights, courts examine "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *V & V Food Prods., Inc.* v. *Cacique Cheese Co.*, 683 F. Supp. 662, 668 (N.D. Ill. 1988) (quoting *Natural Footwear Ltd.* v. *Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3d Cir. 1985). Plaintiffs must show that they have achieved sufficient market penetration in the area of Naperville, Illinois, where the

13

Foundation is operating, such that there is real likelihood of confusion among customers and its mark must be protected.

If a senior user has an unregistered yet protectable mark, a junior user may defend against a § 1125(a) claim by asserting a Tea Rose-*Rectanus* defense. *See Hanover Star Milling Co.* v. *Metcalf*, 240 U.S. 403 (1916); *United Drug Co.* v. *Theodore Rectanus Co.*, 248 U.S. 90 (1918). These Supreme Court cases teach that a "senior user of an unregistered mark cannot stop the use of a territorially 'remote' good faith … junior user who was first to use the mark in that territory." 4 MCCARTHY, § 26:2. The Seventh Circuit refers to this rule as the "good faith junior user" defense. *4SEMO.com Inc.* v. *S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 912 (7th Cir. 2019) (citing *Money Store* v. *Harriscorp Fin., Inc.*, 689 F.2d 666, 674 (7th Cir. 1982)).

Both plaintiffs fail to show they have achieved sufficient market penetration in Illinois to warrant protection of their common law rights. Parties agree that 19 MK has never actually used the mark. As such, it cannot show market penetration in Illinois. And OFCT has so little to offer by way of its presence in Illinois that the court can hardly walk through the four factors meant to illuminate market penetration.

OFCT argues that it solicited donations through its website and social media platforms and that those solicitations are available nationwide, citing Genzer's second declaration for support, specifically, that "OV3RWATCH FOUNDATION's audience includes donors, supporters, law-enforcement personnel, and volunteers who *may be located* in multiple states and foreign countries." (Dkt. 61-1 ¶ 15) (emphasis added). The Foundation argues that paragraph 15 is inadmissible under Federal Rule of Evidence 602, due to the declarant's lack of personal knowledge as to location. The court agrees that this demonstrates speculation by the declarant rather than his personal knowledge. *See Joseph P. Caulfield & Assocs., Inc.* v. *Litho Prods., Inc.*,

14

155 F.3d 883, 888 (7th Cir. 1998) (affidavit testimony on issues of which the declarant lacks personal knowledge is insufficient). The court therefore does not credit this paragraph. *Smith* v. *City of Chicago*, 785 F.Supp.3d 356 (N.D. Ill., 2025) (quoting *Wheatley* v. *Factory Card and Party Outlet*, 826 F.3d 412, 421 (7th Cir. 2016)) ("[T]he evidence does not need to be presented in admissible form at summary judgment 'but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial.'").

Plaintiffs go on to argue that they have evidence that OFCT's activities are not confined to a three-county Houston footprint, as the Foundation asserts. They point to Genzer's second declaration again to show that OFCT has supported public-safety and youth programming related to national competitions in Nevada and Tennessee and that OFCT's hurricane-related activity occurred outside of Houston, though they do not specify where. This may be so, but it has nothing to do with Illinois. Plaintiffs simply have not offered a shred of evidence that they have ever had any contact with the state or anyone in it. OFCT has no common law rights to protect in the state, and, as 19 MK has never even used the mark, it has nothing to protect either.

Moreover, the Foundation was the first to use the mark in Illinois, so even if OFCT could show market penetration in Illinois, the Foundation would have an effective junior user defense. OFCT argues against this defense by again pointing to the boundlessness of the internet, asserting that where "a party solicits nationally through online channels, 'remoteness' is not a box-checking exercise but a fact question about real-world recognition and confusion risk." (Dkt. 60 at 5.) OFCT argues that because the Foundation cannot show that it is remote, it cannot establish the defense. But as explained above, "the internet is not [] a geographic territory to be subdivided[.] … Market penetration by internet use of a mark should be determined, primarily by

15

evidence as to the place where buyers actually purchased the goods and services advertised on the internet site. It is the location of customers that indicates the extent of territorial penetration." MCCARTHY, § 26:30.50.

The Foundation runs its organization and operations out of Naperville, Illinois, while plaintiffs have had no contacts with Illinois. Though parties' activities may overlap on the internet, "plaintiff [may not] assume[] that the internet is a territory in which he can establish exclusive rights." MCCARTHY, § 26:30.50 (citing *Dudley* v. *Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012) (permitting concurrent use of a contested mark on the internet, as holding otherwise would allow one user to monopolize the internet to the exclusion of other lawful users of the same mark and undermine the benefits and security provided by federal registration)). Based on the undisputed facts submitted, the Foundation was the first to use the mark in Illinois, and plaintiffs fail to assert that they have ever used the mark in Illinois. The court therefore grants summary judgment for the Foundation on plaintiffs' § 1125(a) claim and denies plaintiffs' motion on the same.

## III.     Tortious Interference

The Foundation moves for summary judgment on its counterclaim for tortious interference with prospective economic advantage. Plaintiffs move for summary judgment on the same. The Foundation asserts that 19 MK intentionally interfered with the Foundation's prospective economic advantage by threatening to sue podcasters on whose shows Turner had previously appeared to discuss the Foundation's work. As a result, the Foundation asserts that it stopped receiving the increase in donations that would come after Turner appeared on podcasts.

### A. *Noerr-Pennington* Defense

Plaintiffs begin by arguing that the counterclaim is barred by the *Noerr-Pennington* doctrine. The doctrine stems from the First Amendment's protection of "the right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I. The doctrine creates antitrust liability immunity for a party that exercises its First Amendment right to petition the government for redress. *E. R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 670 (1965). The Supreme Court has clarified that this includes parties that bring legitimate disputes to the courts for judicial resolution. *Pro. Real Est. Invs., Inc.* v. *Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–57 (1993); *Cal. Motor Transp. Co.* v. *Trucking Unlimited*, 404 U.S. 508, 510–11 (1972). Petitioning conduct is not protected if it is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. Although the doctrine stems from antitrust law, it can apply to tortious interference claims. *See Theme Promotions, Inc.* v. *News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *Video Int'l Prod., Inc.* v. *Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988); *Havoco of Am., Ltd.* v. *Hollobow*, 702 F.2d 643, 649 (7th Cir. 1983) (noting that the doctrine has been applied to protect the First Amendment right to petition against claims of tortious interference with business relationships).

The *Noerr-Penington* doctrine is an affirmative defense. *Int'l Star Registry of Ill., Ltd.* v. *RGIFTS Ltd.*, No. 21 CV 6446, 2025 WL 2766304, at *6 (N.D. Ill. Sept. 26, 2025); *see also Waugh Chapel S., LLC* v. *United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 359–60 (4th Cir. 2013). "Federal Rule of Civil Procedure 8(c) requires that defendants raise all affirmative defenses that will defeat the allegations in the complaint in a responsive pleading."

*Castro* v. *Chicago Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004). "[W]e must not countenance attempts to invoke [affirmative] defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff." *Venters* v. *City of Delphi*, 123 F.3d 956, 969 (7th Cir. 1997).

This is just what 19 MK and OFCT did. After their motion to dismiss counterclaims was denied on October 20, 2025, 19 MK and OFCT had 14 days to file an answer. Fed. R. Civ. P. 12(a)(4)(A). Instead, they filed their answer almost two and a half months late, on January 14, 2026, alongside their summary judgment reply, without requesting leave of the court for a late filing, and presumably only after the Foundation pointed out their deficiency in its response to plaintiffs' motion for summary judgment. 19 MK and OFCT have therefore waived the defense, and the court will not examine its merits. *See Venters*, 123 F.3d at 968; *see also Roe* v. *Sears, Roebuck & Co.*, 132 F.2d 829, 832 (7th Cir. 1943) (summary judgment reversed where affirmative defense was not raised in answer and defendant never sought district court's leave to correct omission).

### B. Merits of Tortious Interference Counterclaim

The court therefore turns to the merits of the tortious interference with prospective economic advantage claim itself. To prevail on a tortious interference claim in Illinois, a plaintiff must show "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damages to the plaintiff resulting from the defendant's interference." *Foster* v. *Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (citing *Voyles* v. *Sandia Mortg. Co.*, 751 N.E.2d 1126, 1133 (Ill. 2001)).

18

Regarding the first factor, a valid business relationship does not require a contract between the parties. *City of Rock Falls* v. *Chicago Title & Tr. Co.*, 300 N.E.2d 331 (Ill. App. Ct. 1973). The podcasts were valuable promotion for the Foundation and, as a result of the promotion, the Foundation raised funds, creating a business relationship. In addition, there was reasonable expectancy that the relationship would continue between Turner/the Foundation and the podcasts. Turner testified as such, and 19 MK and OFCT were clearly concerned that the relationships would continue, as they sent the podcasters cease-and-desist letters. (Dkt. 49-16 at 8.) ("Commit to abstaining from incorporating any references to the 'OV3RWATCH FOUNDATION' brand … in any subsequent content[.]"). This fact also satisfies the second factor: the cease-and-desist letters show that 19 MK was aware that the relationships could be ongoing.

But the court cannot find for the Foundation on the third factor, as it has not proffered evidence that the warnings were unjustified. In its letters, 19 MK told the podcasts that,

> by hosting Mr. Turner and promoting THE OVERWATCH FOUNDATION trademark on your podcasts, you may be subject to 'Derivative Liability' in the form of contributory trademark infringement. Under derivative liability principles, a person can be held liable for trademark infringement by another if they provide services to an infringer knowing or having reason to believe that infringement will occur. By providing a platform for Mr. Turner, you may have indirectly facilitated trademark infringement.

(Dkt. 49-16 at 6–7.) 19 MK's characterization of contributory trademark infringement is largely accurate. "It is well established that 'if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially [*sic*] responsible for any harm done as a result of the deceit.'" *Hard Rock Cafe Licensing Corp.* v. *Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir. 1992) (quoting *Inwood Labs., Inc.* v. *Ives Labs., Inc.*, 456 U.S. 844, 854 (1982)). "Contributory infringement requires

proof of direct infringement by a third party, as well as the defendant's intent and knowledge of the wrongful activities of its distributors." *Slep-Tone Ent. Corp.* v. *Elwood Enters., Inc.*, No. 13 C 7346, 2014 WL 1612891, at *3 (N.D. Ill. Apr. 21, 2014) (citing *David Berg & Co.* v. *Gatto Int'l Trading Co., Inc.*, 884 F.2d 306, 311 (7th Cir. 1989)).

At this point in the analysis, it is clear that there was no contributory trademark infringement on the part of the podcasters, because the Foundation was not infringing. So the warnings in 19 MK's letter would not have been borne out. But it took a good deal of legal research and reasoning to arrive at this conclusion. 19 MK had registered the "OV3RWATCH FOUNDATION" trademarks by the time the letters were sent. As discussed *supra*, the registrations gave 19 MK a rebuttable presumption of validity of its marks. The Foundation has effectively rebutted that presumption, but it has not proffered evidence that, at the time the letters were sent, it was unreasonable for 19 MK to believe that the Foundation was infringing on its marks and that the podcasts were helping it do so. As such, the cease-and-desist letters do not rise to the level of an unjustified interference in the business relationship. All four factors must be present to find in the Foundation's favor on this claim. As it fails on the third factor, the court does not address the fourth. The Foundation's motion for summary judgment on tortious interference is denied. 19 MK and OFCT's motion for summary judgment on the same is granted.

## IV.    Cancellation Counterclaims

19 MK and OFCT move for summary judgment on the Foundation's remaining counterclaims of naked licensing and non-use. The Foundation does not independently move for summary judgment on these claims but argues that there remain questions of fact as to whether

20

OFCT is operating under a naked license and whether OFCT has actually used the mark, including whether it has solicited charitable donations under it.

### A. Cancellation Due to Naked Licensing

Naked licensing occurs when a licensor allows others to use a mark without exercising "reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee." *Eva's Bridal Ltd.* v. *Halanick Enters., Inc.*, 639 F.3d 788, 789 (7th Cir. 2011) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 (1995)). Evidence of uncontrolled licensing may include a license agreement that does not require the licensee to use the mark in a particular way and does not give the licensor any power over how business is conducted. *See Eva's Bridal*, 639 F.3d at 789–90. It may also include a showing of lack of supervision or control by the licensor over how the mark is used. *Id*.

19 MK and OFCT argue that both entities are "closely controlled" and that "representatives for Plaintiff will testify that all use of "OV3RWATCH FOUNDATION" must be approved by them." (Dkt. 56 at 17.) But at the summary judgment stage, it is not a question of what *will* be testified to. The court must examine what exists in the record. As plaintiffs say, at summary judgment, one "must 'put up' admissible evidence, not conjecture." (Dkt. 65 at 8.) In the licensing agreement between 19 MK and OFCT, there is no mention of 19 MK (the licensor) exercising quality control over OFCT's (the licensee) use of the mark. Genzer, in both of his declarations, states that he, as the managing representative of 19 MK, controls the use of the marks and oversees OFCT's brand. But the declaration offers no details of his control beyond this conclusional statement. And in his deposition, Genzer's control does not sound so iron clad. When asked how the "OV3RWATCH FOUNDATION" mark is used in connection with a

21

National Explorer competition in Tennessee where OFCT volunteers were in attendance, Genzer responded,

> "[I]f they are going out there … they would have, you know, merchandise to sell to raise funds[.] There also is, I would call, like, you know, sponsor-type thing. Hey, you know, underwritten or supported by OV3RWATCH that gets discussed or communicated at that event. I do not personally attend those events. So beyond that, I would be limited in my understanding of—of just how extensive the—the brand gets communicated and marketed."

(Dkt. 59-1 at 336:16–337:5.) The court concludes that there remains a genuine question as to 19 MK's control over the mark. 19 MK and OFCT's summary judgment motion as to the Foundation's naked licensing counterclaim is therefore denied, and the claim may proceed.

### B. Cancellation Due to Non-Use

Finally,[6] the court comes to the Foundation's abandonment by non-use counterclaim. "A trademark is abandoned if its 'use in commerce' has been discontinued with no intent to resume use." *Specht*, 747 F.3d at 934 (citing 15 U.S.C. § 1127). Under § 1127, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment."

19 MK and OFCT argue that the Foundation does not have documents supporting any allegation of non-use, nor any evidence regarding plaintiffs' internal licensing practices. The Foundation, meanwhile, asserts that there are substantial questions about whether OFCT has actually used the mark on each of the goods and services identified in the trademark registrations. As an example, the Foundation points to Genzer's deposition in which he testified that one trademark registration identified "long-sleeved t-shirts" sold under the mark but that

---

[6] 19 MK and OFCT make arguments against certain of the Foundation's defenses, writing, "Defendant asserts a cluster of affirmative defenses, including non-use, abandonment, naked licensing, and laches, that simply mirror its cancellation theories, along with boilerplate defenses such as waiver, estoppel, unclean hands, and failure to mitigate." (Dkt. 56 at 23.) The Foundation points out that it has never asserted laches, waiver, estoppel, unclean hands, or failure to mitigate either as affirmative defenses or counterclaims. The court therefore disregards plaintiffs' motion for summary judgment on those issues.

OFCT has never sold long-sleeve t-shirts. The Foundation argues this is sufficient basis on which to cancel the mark, or at least portions of it. It also points to the lack of evidence that plaintiffs have ever solicited or accepted a donation for charitable services under the mark, with Genzer testifying only that OFCT received less than $50,000 in donations each year, which permitted it to file Form 990-EZ with the Internal Revenue Service.

Plaintiffs argue that the undisputed record "establishes continuous use of the OV3RWATCH FOUNDATION mark in connection with charitable services, fundraising, and related activities." (Dkt. 65 at 8.) The record on this front, however, is highly disputed. While the court has managed to come to ground on certain of the disputed facts (like OFCT's selling t-shirts in four states), where and when OFCT has actually used the mark remains unclear and in dispute. The court concludes that there remains a genuine question as to OFCT's use of the mark. 19 MK and OFCT's summary judgment motion as to the Foundation's non-use counterclaim is therefore denied, and the claim may proceed.

## CONCLUSION AND ORDER

The Foundation's motion (dkt. 47) is granted in part and denied in part, and plaintiffs' motion (dkt. 56) is granted in part and denied in part. The case will be called on August 12, 2026, at 9:30 a.m. in courtroom 2201 to set a trial date. In the meantime, the parties are encouraged to engage in a sincere effort to settle their dispute. If the assistance of the designated magistrate judge is needed, the parties may request that court refer the case for a settlement conference.

Date: July 2, 2026

_____
U.S. District Judge Joan H. Lefkow

23